Anthony J. GRACZYK,
Plaintiff-Appellant,

v.

UNITED STEELWORKERS OF AMERICA, Defendant-Appellee.

John HOWARD, Peter Calacci, and Harold Picard, Plaintiffs-Appellants,

v.

UNITED STEELWORKERS OF AMERICA, Defendant-Appellee.

Nos. 83–2968, 83–3044.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 3, 1984.

Decided May 17, 1985.[*]

As Amended May 20, 1985.

---

[*] Pursuant to Circuit Rule 16(e), this opinion has been circulated among all judges of this court in regular active service, because it creates a conflict with the decision of the United States Court of Appeals for the Sixth Circuit in *Anness v. United Steelworkers of America,* 707 F.2d 917 (6th Cir.1983). *See infra* note 12. No judge favored rehearing *en banc* on this issue.

Lawrence Jay Weiner, Weiner, Neuman & Spak, Chicago, Ill., for plaintiffs-appellants.

Richard Brean, United Steelworkers of America, Pittsburgh, Pa., for defendant-appellee.

Before ESCHBACH, COFFEY and FLAUM, Circuit Judges.

ESCHBACH, Circuit Judge.

The primary question presented by these consolidated appeals is whether the district court erred in concluding that the 1977 collective-bargaining agreement at issue was "in effect" on September 1, 1977, for the purposes of § 2(b) of P.L. No. 95–256, which amended the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 ("ADEA"), and, therefore, that the agreement was exempted from the application of those amendments at the time of appellants' retirement. For the reasons developed below, we have determined that the district court's interpretation of both § 2(b) and the 1977 labor agreement was correct.

I

## A. Collective-Bargaining Agreements

The United Steelworkers of America ("USWA") is a labor organization that represents workers in the steel and related industries. During the period under consideration, the union employed approximately 800 individuals as "staff representatives," who would act as agents of the International for the over 5,000 local unions. The USWA staff representatives themselves were represented by a labor organization, the Staffman's Organizing Committee ("SOC").

Appellant Graczyk was employed as a staff representative by the USWA from July 1943 to October 1, 1979. The terms and conditions of his employment were determined by collective-bargaining agreements negotiated and signed between the SOC and the USWA. The six agreements—in 1966, 1968, 1970, 1971, 1974, and 1977—under which Graczyk was employed provided for mandatory retirement at age 65.[1]

On May 9, 1977, the SOC notified the USWA that the SOC wished to terminate the agreement dated August 1, 1974. Article XI of the 1974 agreement provided that the contract would:

> trustees, with the approval of the International Executive Board, to retire any employee who attained age 62 and had accumulated 20 years of service credits; and (4) *mandatory retirement for all employees at age 65.*
>
> In March 1970, the provision granting the pension trustees the right to retire any employee with 20 years of service credit at age 62 was deleted.

---

**1.** The mandatory retirement provision was part of a policy of the International's executive board adopted on January 26, 1966, and made effective as of July 1, 1966. It was incorporated by reference into the 1977 agreement. The 1966 policy provided for (1) optional retirement with full pension at age 60 for employees with 20 years of service; (2) optional retirement at age 55 with a reduced pension for employees with 10 years of service; (3) the right of the pension

continue in effect until such time as the [USWA] has completed negotiations and reached new agreements with the aluminum industry, nonferrous and basic steel industry, in *1977*. Not later than 30 days thereafter, the parties will make arrangements to meet and negotiate a new Agreement. This Agremeent shall continue in effect until either party notifies the other of its desire to terminate, or a new Agreement is reached by the parties. It is further understood that the effective date of any Agreement reached by the parties subsequent to July 31, *1977*, shall be effective August 1, 1977, unless otherwise mutually agreed.

(emphasis in original)

The negotiations between the USWA and the SOC began in July 1977, and were completed on or about October 12, 1977; the new contract was formally signed on November 1, 1977, and provided that:

This Agreement, dated as of August 1, 1977, is between the [USWA] and the [SOC]. Except as otherwise specified herein, the provisions of this Agreement shall be effective August 1, 1977. This Agreement supersedes and replaces the Agreement between the parties dated August 1, 1974.

When the 1977 agreement was signed, the mandatory retirement policy was consistent with the requirements of the ADEA. In *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444 (1977), the Supreme Court held that early retirement of an employee pursuant to a mandatory retirement provision of a bona-fide retirement plan was not prohibited by the ADEA. However, on April 6, 1978, Congress overruled·*McMann* by enacting P.L.

No. 95–256, 92 Stat. 189 ("1978 amendments"), which amended ADEA § 12, 29 U.S.C. § 631, to provide protection for individuals "who are at least 40 years of age but less than 70 years of age." This amendment to § 12 became effective on January 1, 1979. In addition, § 4(f)(2), 29 U.S.C. § 623(f)(2), of the Act was amended to provide that no "seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by [29 U.S.C. § 631(a) ] because of the age of such individual." [2]

Section 2(b) of P.L. No. 95–256 set out the effective date of the amendment to § 4(f)(2) of the Act:

The amendment [to 29 U.S.C. § 623(f)(2) ] shall take effect on [April 6, 1978], except that, in the case of employees covered by a collective bargaining agreement which is in effect on September 1, 1977, which was entered into by a labor organization ..., and which would otherwise be prohibited by [29 U.S.C. § 631], the amendment [to 29 U.S.C. § 623(f)(2) ] shall take effect upon the termination of such agreement or on January 1, 1980, whichever occurs first.

The USWA sought an opinion from the Department of Labor ("DOL")[3] as to the effect of the 1978 amendments. On July 21, 1978, representatives of the USWA met with certain DOL officials, including Donald Elisburg, the DOL's Assistant Secretary for Employment Standards. At the meeting, the DOL representatives provided an oral opinion that the USWA's 1977 collective-bargaining agreement was "in effect" on September 1, 1977, for the purposes of § 2(b) of the 1978 amendments. This conclusion was not memorialized in

---

**2.** Section 4(f)(2), 29 U.S.C. § 623(f)(2), as amended, provides:

It shall not be unlawful for an employer, employment agency, or labor organization—
. . . .
(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such

seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual.

**3.** The DOL originally had authority for the implementation and interpretation of the ADEA. Pursuant to a 1978 reorganization plan, that authority was transferred to the EEOC on July 1, 1979. *See* 43 Fed.Reg. 19,807 (1978).

any document. Assistant Secretary Elisburg did, however, in responding to a request from Leroy D. Clark, General Counsel of the EEOC, provide in a letter dated October 20, 1980, an account of the July 1978 meeting:

> To the best of my recollection we were unanimous in stating that such an agreement would be considered by us to be "in effect on September 1, 1977" *if* the purpose of the retroactivity was not a subterfuge to get around the purposes of the Act and to avoid application of the ADEA amendments as of January 1, 1979. As we were informed by the [USWA's] counsel that such retroactivity was completely consistent with past practice, that the retroactivity feature of the 1977 contract was agreed to by the parties in 1974, and that the retroactivity became effective when the current 1977 agreement was signed, which was well before the adoption of the ADEA amendments, it seemed clear to us that the retroactivity was not a bad faith effort by the [USWA] to get around the new age 70 mandatory retirement age.

(emphasis in original)

On July 5, 1979, Graczyk was informed by the USWA that, because he would reach 65 years of age on September 5, 1979, he would be required to retire no later than October 1, 1979, pursuant to the compulsory retirement plan. Graczyk filed a grievance on July 20, 1979, contesting the involuntary retirement and subsequently exhausted the administrative procedures and remedies provided by the USWA. On October 1, 1979, he was retired.

Graczyk then filed a charge with the EEOC on December 12, 1979, in which he maintained that the USWA's termination of his employment violated his rights under the 1978 amendments. The EEOC at first authorized the initiation of a lawsuit by that agency against the USWA for a violation of the ADEA. This position was con-sistent with that taken by the EEOC in its interpretation of the 1978 amendments:

> Where a collective bargaining agreement expired prior to September 1, 1977, and a new agreement was signed subsequent to that date .effective retroactively to the expiration date of the previous agreement, the exemption [of § 2(b) ] does not apply. The expressed congressional intent was to exempt only those agreements which had been "negotiated" before September 1, 1977.

It should be noted that this regulation was not even proposed until November 1979 (after all four plaintiffs had been retired), and was not officially adopted until September 29, 1981 (1428 days after the 1977 agreement was formally signed and 637 days after January 1, 1980, which was the date that the § 2(b) exemption expired).[4]

The decision to proceed with litigation was made before the EEOC was informed of the July 1978 meeting between representatives of the DOL and the USWA. When apprised of the meeting, the EEOC determined that a suit by the government would be inappropriate and, therefore, withdrew authorization for the General Counsel to sue. Graczyk instituted this action on June 9, 1980.

### B. Additional Plaintiffs

Three other USWA staff representatives who were forced to retire in 1979 when they reached age 65—Peter Calacci, John Howard, and Harold Picard ("additional plaintiffs")—sought to join the action instituted by Graczyk. It is undisputed that the additional plaintiffs never filed timely age-discrimination charges with the EEOC relating to their retirement. On June 15, 1981, the trial court granted Graczyk leave under Fed.R.Civ.P. 21 to add the additional plaintiffs to the action. On June 19, 1981, the USWA filed a "Motion to Reconsider Granting of Plaintiff's Motion to Add Additional Plaintiffs or, in the Alternative, to Dismiss Claims of Additional Plaintiffs." The additional plaintiffs' consents were

---

**4.** This rule, now codified at 29 C.F.R. § 1625.-9(d)(3) (1984), was proposed on November 30, 1979, *see* 44 Fed.Reg. 68,858 (1979), and official-ly adopted on September 29, 1981, *see* 46 Fed. Reg. 47,724 (1981).

filed on July 6, 1981. Pursuant to a motion from the USWA, the court entered an order on August 13, 1981, that no new parties could be added after August 21.

On January 28, 1983, the trial court denied the USWA's motion for reconsideration and held over the motion to dismiss. At that time, the court, after being informed that no amended complaint had been filed since the order of June 15, 1981, directed Graczyk to file an amended complaint by February 4, 1983, that would include the names and allegations of the additional plaintiffs. This amendment was apparently requested because discovery had revealed certain factual distinctions in the individual claims of the additional plaintiffs. On March 14, 1983, Graczyk filed a "Motion to File Amended Complaint Instanter." The court denied leave to file the count relating to the additional plaintiffs, but then, without explanation in the minute order, dismissed that count without prejudice. The court also stated during the hearing that the claims of the additional plaintiffs were probably time barred. Graczyk's motion for reconsideration was denied. The additional plaintiffs then filed an appeal, designated No. 83–3044, in this court.

## C. Disposition of Summary-Judgment Motions

Both Graczyk and the USWA moved for summary judgment. In its ruling of October 7, 1983, the district court, after discussing the 1978 amendments and the terms of the 1974 and 1977 agreements, noted that the 1977 contract was signed before the enactment of the 1978 amendments and that Congress "itself provided for retroactive effectiveness, insofar as benefit plans

were concerned, by the . . . provision exempting them if 'in effect' by September 1, 1977, although 'not necessarily written or signed.'" Relying on the legislative history of the 1978 amendments, the district court concluded that it was consistent with § 2(b) to find that the 1977 agreement was "in effect" on that date. The conflicting interpretations of the DOL and EEOC were also noted; although the court found the DOL's construction more persuasive in view of that agency's extended experience with collective-bargaining agreements, it ultimately concluded that neither interpretation was "binding." The court then held that there was no genuine issue of material fact, and that a bona-fide benefit plan that called for retirement at age 65 and that was not a subterfuge designed to evade the purposes of the ADEA was in effect between the USWA and the SOC on plaintiff Graczyk's retirement date, and that this plan was exempt from the 1978 amendments.[5] Accordingly, the USWA's summary-judgment motion was granted and Graczyk's motion was denied. Graczyk then filed an appeal, designated No. 83–2968, in this court, which was subsequently consolidated with the appeal of the additional plaintiffs, No. 83–3044.

## II

### A. Section 2(b) Exemption

Appellants initially argue that the exemption of § 2(b), which extends to collective-bargaining agreements that were "in effect on September 1, 1977," can refer only to those agreements that were negotiated and signed by, as well as effective on, that date. We disagree.[6]

---

5. In so ruling, the district court expressly rejected the Sixth Circuit's decision in *Anness v. United Steelworkers of America,* 707 F.2d 917 (6th Cir.1983), which held that the same 1977 USWA agreement was not "in effect" on September 1, 1977, for the purposes of § 2(b) of the 1978 amendments. *See infra* note 12.

6. We also reject Graczyk's arguments that he was not retired (A) pursuant to a "bona fide" seniority or employee-benefit plan within the meaning of ADEA § 4(f)(2) or (B) pursuant to a collective-bargaining agreement, so that the

§ 2(b) exemption is not available. With reference to the first argument, the USWA 1966 retirement policy, which antedated the enactment of the ADEA, is inexorably linked to the seniority provisions of the collective-bargaining agreement and also controls the application of the pension plan, as it is the status of the staff representative under the agreement that determines the eligibility requirements and benefit levels. Appellants in fact concede that the 1966 policy was a part of the pension plan. In addition, the 1977 agreement, in its article VIII(3)

■ The starting point, of course, in construing any provision is the language of the statute itself. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330 (1979). As a matter of common usage, the term "in effect" is not limited to prospective effectiveness, but also covers retroactive application. Stated in another manner, the term "in effect" certainly includes agreements that are "entered into," "signed," or "in existence" by the relevant date, but also includes those that are "entered into," "signed," or "in existence" after their effective date. The term does not focus on the actual timing of the agreement's execution and implementation, but rather on the intentions of the parties to the agreement, as it is the parties that decide when an agreement shall be effective. They may intend that their agreement be given retroactive application in order to maintain a catenation of contracts—certainly a salutary practice in the collective-bargaining context[7]—without regard to the vicissitudes of their negotiation practices. It would be improvident for this court to find as a matter of law that a legislative exemption referring to agreements "in effect" on a certain date, without further elaboration, would be restricted to only those agreements entered into or in existence prior to that date and that retroactive application was, therefore, necessarily excluded. Congress has not ordinarily used the term in such a limited fashion, and has in fact demonstrated that, when it seeks to exclude retroactive agreements from a certain provision, it is capable of so indicating in an unequivocal fashion. *See, e.g.,* Civil Service Reform Act of 1978, 5 U.S.C. § 7135(a); ERISA, 26 U.S.C. § 410 note (effective date and transitional rules), 29 U.S.C. §§ 1086(b), 1114(b)(2), 1322(b)(1), (7); Act of June 23, 1947, ch. 120, § 102, 61 Stat. 152 (effective date of amendments to National Labor Relations Act).

Indeed, the wording of § 2(b) itself illustrates this distinction. Three requirements must be met before a collective-bargaining agreement is entitled to the exemption: it must be (1) *"in effect on* September 1, 1977,"* (2) *"entered into* by a labor organization," and (3) "otherwise prohibited by the amendment" of 29 U.S.C. § 631 (emphasis added). If Congress meant to exempt only those agreements entered into by a labor organization before September 1, 1977, then we are hard pressed to understand why it would choose this particular formulation. To the contrary, we conclude from the language of § 2(b) that Congress sought to maintain a distinction between the execution of an agreement and its effective date. Thus, § 2(b) does not suggest

and appendix A, specifically refers to the pension plan. Thus, the policy met the criteria of § 4(f)(2) prior to the 1978 amendments. It should also be noted that employees at age 65 were not within the class protected by the ADEA prior to the 1978 amendments. Mandatory retirement at age 65, therefore, could be imposed without regard to the Act. The USWA's retirement policy, however, does now violate the ADEA as amended. In order for an agreement to come within the exemption of § 2(b), the employee need only be forced to retire pursuant to a collective-bargaining agreement that was in effect on the relevant date under terms that would now violate the ADEA. We have determined that the 1977 agreement was "in effect" on the proper date and that it does violate the current version of the ADEA.

With reference to the second argument, it is true that the actual wording of the policy does not physically appear in the contract, but it is incorporated by reference into the agreement; thus, the three requirements of § 2(b) are satisfied.

In his statement of facts, Graczyk claims that the USWA did not impose the same mandatory retirement policy on its elected officials, but has failed to present any legal argument to this court on this point. A party's description of the factual circumstances of a dispute does not impose on the reviewing tribunal an obligation to divine from that recitation all possible legal issues and then to resolve those issues. Any challenge to the USWA's treatment of its elected officials is foreclosed if those issues are not adequately presented by the appellant or raised by a cross-appellant. *See City of Chicago v. United States Dep't of Labor,* 753 F.2d 606, 607 n. 1 (7th Cir.1985); *cf.* Fed.R.App.P. 28(a).

7. For example, retroactive application may help prevent strikes, because it guarantees that employees will be compensated for those hours worked after the expiration of the prior agreement at the new pay scale that is ultimately negotiated.

that agreements signed after September 1, 1977, with an effective date of August 1, 1977, are excluded from the exemption.[8] We move then to a consideration of the legislative history.

The legislative reports relating to § 2(b) neither provide a definition of the term "in effect" nor discuss the exemption in the context of collective-bargaining agreements that are given retroactive application. Nonetheless, the policy behind the provision was clearly articulated:

The reason for the extended effective date ... is to recognize, and provide *maximum deference* to, contracts negotiated between management and labor, consistent with the committee's desire to end mandatory retirement of those workers under age 70. The committee recognizes that these contracts were negotiated in good faith and that reciprocal agreements and concessions were made in exchange for the mandatory retirement provision.

(emphasis added). S.Rep. No. 493, 95th Cong., 1st Sess. 11 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 504, 514.[9]

The statements of Representative Hawkins paralleled the policy expressed in S.Rep. No. 493:

[With respect to] the amendment to delay the effective date for collectively bargained employee benefit plans, the precedent for such a delay was established in the Equal Pay Act of 1963. I would like to quote from the May 23, 1963, Congressional Record in which then-Congressman Robert Griffin states: "... it should be the policy of Congress, I think, not to open up collective bargaining agreements in effect if that is not absolutely necessary. We want to encourage industrial peace and stability, and we do not wish unnecessarily to stir up strikes or labor strife."

123 Cong.Rec. 30,563 (1977); *see also id.* at 34,296 (1977) (remarks of Sen. Williams).

It could, of course, be argued that the ADEA is a "remedial" provision and, therefore, that any exception, including that of § 2(b), must be narrowly construed. As a general matter, the ADEA may benefit from the presumptions associated with a "remedial" statute. *See, e.g., Zimmerman v. North American Signal Co.,* 704 F.2d 347, 353 (7th Cir.1983). This characterization, however, does not invest the Act with a sort of talismanic quality so that all other canons of statutory construction will be disregarded. *Cf. id.* Indeed, in this particular case, where Congress sought to extend "maximum deference" to collective-bargaining agreements, the force of the presumptions in favor of such agreements at least equals, and perhaps overwhelms, the force of the presumptions associated with a "remedial" statute. Stated in another manner, a narrow construction of the § 2(b) exemption is inconsistent with the express desire of the legislature to accord highly deferential treatment to labor agreements.

■ Thus, in view of the language of § 2(b) and the strong legislative expressions of the need to accord "maximum deference" to collective-bargaining agreements, we conclude that Congress intended that any doubtful situation be resolved in favor of upholding such agreements. Absent an explicit declaration from Congress to the contrary, we cannot impute to the legislature an intent in § 2(b) to disregard terms such as those under consideration that are the legitimate result of the collective-bargaining process. *Cf. EEOC v. United Air Lines, Inc.,* 755 F.2d 94, 98 (7th Cir.1985); *Sikora v. American Can Co.,* 622 F.2d 1116, 1122–24 (3d Cir.1980). Indeed, this court acknowledged in *EEOC v. County of Calumet,* 686 F.2d 1249, 1257

---

**8.** We reject appellants' assertion that this court concluded in *EEOC v. County of Calumet,* 686 F.2d 1249, 1257 (7th Cir.1982), that the exemption of § 2(b) covered only those agreements negotiated before, *and* in effect on, September 1, 1977. The meaning of the term "in effect"

was not presented in *Calumet,* as the collective-bargaining agreement under consideration did not become effective until January 1, 1979. *Id.*

**9.** *See also* H.R.Rep. No. 527, 95th Cong., 1st Sess. 8–9 (1977).

(7th Cir.1982), Congress's recognition that "valuable consideration is sometimes given in collective bargaining for concessions which may be prohibited under the ADEA," and that Congress took account of the possible loss of bargain in § 2(b).[10]

The parties to the 1977 agreement intended for that contract to govern their respective rights and obligations for events occurring on September 1, 1977, and thus they clearly considered it "in effect" on that date. Both appellants and appellee agree that the 1974 agreement expired on August 1, 1977. It could be argued that the 1974 agreement remained provisionally in force during the negotiations, but only in the sense that it would maintain the status quo until a new agreement was signed. In any event, the new agreement, as required by the prior contract, stated unequivocally that it "supersede[d] and replace[d]" the 1974 agreement. There is no question that retroactivity was a well-established practice between the parties,[11] that valuable concessions were made by the employer in exchange for the mandatory retirement provisions, and that those provisions were in no way a subterfuge designed to avoid the effect of the 1978 amendments. Furthermore, it should also be noted that the

parties had an excellent business justification for retroactive effectiveness. July 31, 1977, was significant because the 1974 collective bargaining agreements the USWA had signed with the ten leading steel companies expired on that date. Subsequent agreements signed with those industries were to be made effective as of August 1, 1977. Under the express terms of the 1974 agreement with the SOC, negotiations could not even begin with the USWA until the latter had completed negotiations for the workers represented in the aluminum, non-ferrous, and basic steel industries. Nonetheless, retroactive application ensured that the USWA staff representatives would not be economically disadvantaged by this coordinated sequence of contract expirations, as any new agreement SOC negotiated on behalf of its members would become effective on the same date as any new agreement the USWA negotiated with the steel industry on behalf of the USWA members.

■ In conclusion, we find that the 1977 agreement was exempt under § 2(b) of the 1978 amendments and affirm the district

**10.** With reference to the conflicting construction of § 2(b) rendered by the DOL and EEOC, we acknowledge that, while we are not bound by these pronouncements, administrative interpretations are ordinarily entitled to deference. However, in view of the conflicting interpretations, we must undertake our own independent analysis of the meaning of § 2(b). The courts remain the final authority on issues of statutory construction and must reject administrative interpretations that are inconsistent with the statutory mandate or that undermine the policies Congress sought to implement. *See Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 42 (1981). Moreover, if, as in this case, the provision under consideration does not call for special expertise or competence in its interpretation, the judiciary is at least as qualified as an administrative agency to provide that interpretation. *Cf. McKart v. United States,* 395 U.S. 185, 197–99, 89 S.Ct. 1657, 1665 (1969).

We have concluded after our own independent consideration that the 1977 agreement does come within the exemption of § 2(b). We, therefore, reject the EEOC's belated interpretation to the extent that the latter, when applied to

these facts, would exclude the 1977 agreement from the exemption. In view of this disposition, we need not consider the USWA's argument that, after the Supreme Court's decision in *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764 (1983), the EEOC did not have the authority to issue the interpretation because the transfer of jurisdiction to that agency for the implementation of the ADEA was made pursuant to legislation containing a one-house veto provision. *Compare EEOC v. CBS, Inc.,* 743 F.2d 969 (2d Cir.1984) (EEOC without authority after *Chadha* ) *with EEOC v. Hernando Bank, Inc.,* 724 F.2d 1188 (5th Cir.1984) (EEOC retains authority despite *Chadha* ). In addition, although the parties have not so informed us, it would appear that recent congressional enactments may have mooted any question concerning the EEOC's authority to implement the ADEA. *See EEOC v. CBS, Inc.,* 748 F.2d 124 (2d Cir.1984).

**11.** In fact, the 1971 agreement was not formally signed until April 18, 1972, but was dated, and made effective on, August 1, 1971. Similarly, the 1974 agreement was not formally signed until February 14, 1975, but was dated, and made effective on, August 1, 1974.

court's decision that Graczyk's retirement was not a violation of the ADEA.[12]

### B. Additional Plaintiffs

Before considering the claims of the additional plaintiffs, we must first discuss the status of Calacci, Howard, and Picard, because the record evinces considerable confusion on the part of the court, as well as the litigants, as to whether these three individuals were actually parties to this action. The minute order of March 14, 1983, is illustrative of that confusion, as it first denies leave to file an amended complaint that included Calacci, Howard, and Picard, as well as their claims, but then dismisses the amendments relating to the additional parties without prejudice. In addition, the transcripts of later proceedings indicate that the district court considered Calacci, Howard, and Picard to have been parties to the litigation since the order of June 15, 1981, even though they were not named as plaintiffs in the original complaint and no amendment relating to them was subsequently allowed.

We, of course, must attempt to give meaning to the rulings and procedural solecisms present in the record. The parties have given us little guidance in this matter. After a thorough consideration of the record, we conclude that the order of June 15, 1981, constituted an exercise of the court's discretionary power under Fed.R. Civ.P. 21 to add Calacci, Howard, and Picard as parties to this litigation, that the court deemed the original complaint to have been amended by operation of law to conform to that ruling, and that the court did not condition the inclusion of these three individuals on the submission of an amended complaint. Thus, Calacci, Howard, and Picard were in fact parties when, on March 14, 1983, leave to add Count II was denied and Count II was dismissed without prejudice. It was, therefore, error to dismiss the parties on the basis of the late amendment, as the addition of Count II was, in view of the prior rulings of the court, a technicality that would simply conform the pleadings to those prior rulings. Because the court did apparently act on the assumption that the additional plaintiffs were in the action under the original complaint and because it made no mention of the additional plaintiffs in the summary-judgment order of October 7, 1983, the only tenable explanation for the dismissal of Calacci, Howard, and Picard from the action was the court's repeated observation that their cause of action was time barred and thus failed to state a claim upon which relief could be granted. Thus, in considering the proceedings as a whole and the district court's stated reasons for disallowing the amendment of the complaint, we construe the order of March 14, 1983, as a dismissal of the additional plaintiffs with prejudice.

In view of our affirmance of the district court's grant of the USWA's summary-judgment motion, it is unnecessary for us

---

**12.** As we observed in note 5, *supra,* the Sixth Circuit in *Anness v. United Steelworkers of America,* 707 F.2d 917 (6th Cir.1983), concluded that the 1977 USWA agreement was not "in effect" on September 1, 1977, for the purposes of § 2(b). The court found that the term "in effect," without more, "would seem to preclude" the 1977 agreement. For the reasons previously stated, we cannot endorse this restrictive construction. The Sixth Circuit also relied on the EEOC regulation, whereas we have concluded that, under these facts, reliance on the regulation is inappropriate and that this administrative interpretation is inconsistent with the language and purposes of § 2(b) to the extent that it would place the 1977 agreement outside the exemption.

Another ground for the *Anness* decision was the discussion of § 2(b) in S.Rep. No. 493 (*see* *supra* text preceding note 9). The Sixth Circuit, looking to the Report's use of the word "negotiated," stated that "the fair inference as to intent would be that the exemption would apply as to those collective bargaining agreements already negotiated and/or effectuated before September 1, 1977." *Anness,* 707 F.2d at 921. We cannot concur in this conclusion. The Senate Report does evince a solicitude for contracts "negotiated between management and labor" "in good faith." It does not in any way suggest, however, that those negotiations must have been completed before the necessarily arbitrary date of September 1, 1977. To the contrary, it is clear that Congress's overriding concern was with the detrimental reliance by employers on the ADEA before the 1978 amendments. The timing of the negotiations is not alluded to in the Report.

to determine whether the claims of Calacci, Howard, and Picard are in fact time barred because, even if timely, these allegations still fail to state a claim for relief. Similarly, even though it was error to deny the amendment of the original complaint, we may uphold the dismissal of the additional plaintiffs on the basis of our discussion in section II(A), *supra.* The gravamen of the claims of the additional plaintiffs is that their compulsory retirement in 1979 at age 65 pursuant to the 1977 agreement violated the ADEA as amended in 1978. Thus, a determination that appellant Graczyk's retirement was lawful necessarily forecloses recovery for the additional plaintiffs. The dismissal of Calacci, Howard, and Picard, therefore, will be affirmed.

### III

For the reasons stated above, the summary-judgment order in favor of the USWA in appeal No. 83–2968 is AFFIRMED. The district court's judgment of dismissal in appeal No. 83–3044 is AFFIRMED.