Thomas M. **BANDURA** and Mary Ann Bandura, Individually and as Parents and Next Friends of Laura L. Bandura and Brittain Bandura, Minors, Plaintiffs–Appellees,

v.

**ORKIN EXTERMINATING CO., INC.,** Defendant–Appellant.

No. 87–2352.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 7, 1988.

Decided Dec. 12, 1988.

Mark S. Grotefeld, Grotefeld & Assoc., Chtd., Chicago, Ill., for defendant-appellant.

Michael D. Block, Block Krockey Cernugel & Cowgill, P.C., Joliett, Ill., for plaintiffs-appellees.

Before WOOD and COFFEY, Circuit Judges, and GRANT, Senior District Judge.*

COFFEY, Circuit Judge.

Defendant-appellant Orkin Exterminating Company appeals a jury verdict awarding $625,000 in damages for personal injuries and property damage suffered by plaintiffs-appellees Thomas and Mary Ann Bandura. In response to special interrogatories submitted by the Banduras, the jury specifically found that Orkin had violated the Illinois Consumer Fraud and Deceptive Practices Act, Ill.Rev.Stat. ch. 121½, ¶ 261 *et seq.* Based on this special finding, the United States District Court for the Northern District of Illinois, the Honorable Brian Barnett Duff, presiding, assessed Orkin $90,036.66 in costs and $208,333.33 in attorneys' fees. We affirm.

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

## I.

In early December, 1981, Mary Ann Bandura contacted Orkin Exterminating Company's office in Shorewood, Illinois, concerning a bug she had observed in her home in Coal City, Illinois, that she suspected might be a termite. John Pearce, an Orkin representative, inspected the Bandura home on December 12. Upon completion of his inspection, Pearce showed Thomas Bandura a board he had found in the crawl space upon which a small, white bug was resting. Pearce identified the bug as a termite and informed Mr. Bandura that there was no damage to his home, but also stated that his house was located in a termite infested area. Pearce then provided Mr. Bandura with a sales brochure entitled "Termites Strike More American Homes than Fire." The Banduras contend that based upon this information they hired Orkin to treat their home against the infestation of termites. On December 21 Orkin treated the Banduras' home with Orkil, Orkin's form of termiticide containing the chemicals chlordane and heptachlor.

Immediately after the termiticide application, the Banduras noticed a strong odor in their home that had not been present prior to the application. The Banduras telephoned Orkin to complain of the strong chemical odor and were assured that it would dissipate within one to seven days. However, the odor did not dissipate within this time period. Indeed, the odor continued to persist in some parts of the house at the time this action was filed in November 1983.

While this odor continued to persist in the Bandura home, Mrs. Bandura noticed some unusual physical symptoms including fatigue, numbness, tingling in the extremities and face, and headaches. In July 1982, she saw her gynecologist and reported melancholic behavior changes, chest pains and tingling of the legs. In November 1982, Mrs. Bandura saw another doctor and complained of much of the above and additionally, an unusual hoarseness. Mrs. Bandura's physical condition declined markedly in the first half of February 1983 and as a result of this, her doctor admitted Mrs. Bandura to the hospital on February 14, 1983. Hospital tests revealed various problems which are consistent with chlordane poisoning, although her doctors made no specific diagnosis at this time. Mrs. Bandura's condition improved during this hospital stay, and after five days she was released from hospital confinement. After spending a day at home, Mrs. Bandura suffered a relapse. She reentered the hospital and stayed for eleven more days, some of which she spent in the intensive care unit. None of the physicians attending Mrs. Bandura had been made aware of the termiticide treatments to her home and hence, the possible link between the chlordane contained in the termiticide and Mrs. Bandura's various afflictions. It was only in April 1983 that the Banduras became aware, through a segment on the television program "Sixty Minutes," of the health hazards of chlordane.

After observing the "Sixty Minutes" program on chlordane, the Banduras immediately telephoned Orkin and requested that they install "temp vents" in their house. Although Orkin installed the vents, the odor persisted. The Banduras continued to complain to Orkin, but Orkin merely reassured them that the odor would soon dissipate. Approximately five months later in the fall of 1983, the Banduras contacted the Illinois Department of Public Health. The Department assigned Pest Control Inspector Wilder to examine and investigate the application of the termiticide in the Banduras' home. Upon completion, he discovered the presence of chlordane in their heating system. Wilder also concluded that Orkin had applied the termiticide above rather than below ground level, thus violating both acceptable industry practice and the termiticide's label instructions. Orkin branch manager Snopeck admitted to Wilder that if Orkin had properly applied the termiticide below ground level, there would not have been chlordane fumes present in the Banduras' forced air heating system. Wilder then sought to interview Roger Hanson, the Orkin employee who applied the termiticide in the Banduras' residence. Snopeck informed Wilder that Hanson was no longer with Orkin and that

they were unable to supply any further information about him, when in fact, Hanson was still in Orkin's employ but working out of another branch office. Based upon Wilder's inspection, findings and recommendations, the Banduras' entire forced air heating system was shut down, and replaced by electric base board heat. This change improved the problem somewhat as it eliminated the chemical odor in certain areas of the home, but the smell still persisted in other areas of the Banduras' residence.

On November 2, 1983, the Banduras commenced this action for personal injuries and property damage against Orkin on theories of negligence, breach of warranty, and products liability.[1] The Banduras later amended their complaint to include counts based on the Illinois Consumer Fraud and Deceptive Practices Act ("ICFDPA"), *supra,* and requests for punitive damages, attorneys' fees, and litigation costs thereunder. Orkin removed the action pursuant to 28 U.S.C. § 1441 to the United States District Court for the Northern District of Illinois based on diversity of citizenship, 28 U.S.C. § 1332.

A jury trial commenced on April 21, 1986. At the close of the evidence, the trial judge granted Orkin's motions for directed verdict on the breach of warranty and punitive damage issues, but denied the motion with respect to the counts based on the ICFDPA. On May 6, 1986, the jury returned a general verdict in favor of Mary Ann Bandura in the amount of $550,000 and Thomas Bandura in the amount of $75,000. In response to the special interrogatories, the jury specifically found that Orkin had violated the ICFDPA. Based on this finding the Banduras petitioned the court for an award of $208,333.33 in attorneys' fees and $90,036.66 in costs under section 10a of the ICFDPA, Ill.Rev.Stat. ch. 121½, ¶ 270a, which the court eventually granted. On May 15, 1986, Orkin filed a motion for judgment notwithstanding the verdict or in the alternative for new trial

alleging that the Banduras had failed to prove both that their illnesses resulted from exposure to the chemicals in Orkin's termiticide and that Orkin had violated the ICFDPA in persuading the Banduras to purchase the termiticide treatment. The district court denied Orkin's motion, 664 F.Supp. 1218, and Orkin appealed.

Orkin advances three arguments on appeal in support of its contention that the jury's verdict in favor of the Banduras must be set aside and the trial judge's rulings must be overturned. First, Orkin contends that the trial judge erred in denying its motions for directed verdict and judgment notwithstanding the verdict on the consumer fraud claims because of the absence of clear and convincing evidence that the Orkin salesman misrepresented any statement of fact. Next, Orkin claims that the jury's verdict was against the manifest weight of the evidence concerning the negligence claims because there was insufficient evidence to support a finding that the termiticide was improperly or unreasonably applied. Finally, Orkin alleges that the jury's verdict was against the manifest weight of the evidence concerning the products liability claims because there was insufficient evidence to support a finding that the termiticide was unreasonably dangerous.

## II.

In considering Orkin's claim that the trial judge improperly denied its motions for directed verdict and judgment notwithstanding the verdict on the Banduras' consumer fraud claims, we note that the standard under which we review the denial of such motions is the same as that applied by the trial court, assuming that the trial court applied the correct standard. *Panter v. Marshall Field & Co.,* 646 F.2d 271, 281 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). A motion for directed verdict raises only a question of law; thus, our review is *de novo. See*

---

1. At the time of trial, Mary Ann Bandura was diagnosed as having chronic systemic poisoning to various organs, thereby causing hypersensitivity to certain chemicals and an immune deficiency syndrome placing her at an extraordinarily high risk of developing cancer. Thomas Bandura was diagnosed as having an immune system disregulation.

*North v. Madison Area Association for Retarded Citizens*, 844 F.2d 401, 403 (7th Cir.1988); *Anderson v. Gutschenritter*, 836 F.2d 346, 348 (7th Cir.1988). Because the district court's jurisdiction was based on diversity of citizenship, our standard of review is that of the law of the forum state, Illinois in this case. *Eggert v. Weisz*, 839 F.2d 1261, 1263 (7th Cir.1988); *Davlan v. Otis Elevator Co.*, 816 F.2d 287, 289 (7th Cir.1987). The trial court properly determined that under Illinois law, "verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern Railroad*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513 (1967).

■ Orkin urges this court to reverse the district court's denial of its motions because the district court failed to accurately depict or adequately view the trial testimony and, as a result, rendered a legally impermissible ruling. In support of this conclusion, Orkin initially argues that the Banduras' claim of injury under the ICFDPA is unfounded because they failed to prove the six elements of fraud required by *Tague v. Molitor Motor Co.*, 139 Ill. App.3d 313, 93 Ill.Dec. 769, 487 N.E.2d 436 (1985). Orkin overlooks the fact that the six elements required under *Tague* pertain only to common law fraud, not a violation of the ICFDPA. Illinois law is clear that it is unnecessary to prove the elements of common law fraud in order to recover under the ICFDPA. *People ex rel. Fahner v. American Buyers Club*, 115 Ill.App.3d 759, 71 Ill.Dec. 216, 450 N.E.2d 904 (1983). The Illinois courts have consistently recognized that a cause of action based on common law fraud and a cause of action under the ICFDPA are entirely separate. *See General Motors Acceptance Corp. v. Grissom*, 150 Ill.App.3d 62, 103 Ill.Dec. 447, 501 N.E.2d 764 (1986); *Kellerman v. Mar–Rue Realty and Builders, Inc.*, 132 Ill.App.3d 300, 87 Ill.Dec. 267, 476 N.E.2d 1259 (1985); *Fahner, supra; Perlman v. Time*, 64 Ill. App.3d 190, 20 Ill.Dec. 831, 380 N.E.2d 1040 (1978). Indeed, *Tague* itself involved a two-count complaint: one count based on common law fraud and the other based on a violation of the ICFDPA. 93 Ill.Dec. at 770–71, 487 N.E.2d at 437–38.

In order to establish a violation of the ICFDPA, a plaintiff must establish a "deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of a material fact" with the intent that others rely upon that fact. Ill.Rev.Stat. ch. 121½, ¶ 262 (1983). *See also Grissom*, 103 Ill.Dec. at 448, 501 N.E.2d at 765; *Warren v. LeMay*, 142 Ill. App.3d 550, 96 Ill.Dec. 418, 425, 491 N.E.2d 464, 471 (1986). In *Warren* the Appellate Court of Illinois went on to state:

"Persons harmed by a violation of this statute have a private right of action for damages, or any other relief deemed proper by the court.... In reviewing such private rights of action, we are guided by the terms of section 1(a) of the statute ..., which expressly provides, 'this Act shall be liberally construed to effect the purposes thereof.' As this court has previously ruled, '... we perceive a clear mandate from the Illinois legislature that the courts of the State are to utilize the Consumer Fraud Act to the utmost degree in eradicating all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers.'"

96 Ill.Dec. at 425, 491 N.E.2d at 471 (citations omitted).

It is undisputed that John Pearce, an Orkin employee, visited the Banduras' home, entered the crawl space and emerged with a piece of wood on which a white bug was resting and identified the bug as a termite. Pearce displayed the board with the bug to Tom Bandura and left him with a pamphlet entitled "Termites Strike More American Homes than Fire." It is also undisputed that this inspection and sales pitch by Pearce occurred during what is known as a "termite blitz," a time period in which Orkin employees "comb [the] area that [the Shorewood Orkin] branch was covering and ... drum up sales."

At trial, the Banduras presented entomologist Stanley Rachesky who, certified by the trial court as an expert witness, testified that upon inspection of the Banduras' home on April 10, 1985, he found no evidence of any termites in the house at that time and that, in his opinion, there never had been termites in the Banduras home. Rachesky based his opinion on the lack of termite mud tubes in the crawl space where Pearce found the board.[2] Additionally, Tom Bandura testified that the bug Pearce showed to him was white and about one-quarter of an inch long, about the size of a piece of rice. Rachesky opined that it was unlikely that the bug Pearce showed to Tom Bandura was actually a termite because the only white termites are worker termites; "workers" are very tiny and do not usually crawl out into the open. Rather, they remain inside the mud tubes, which were not present in the Banduras' crawl space, and can only be seen when and if the tubes are broken open.

■ Orkin argues that this evidence fails to prove that Pearce made any misrepresentation concerning the presence of termites in the Banduras' home in order to induce them to believe that termiticide application was necessary to eradicate the present or future risk of termite damage from their home. We agree with the conclusion of the district judge that at the very least this evidence raises the inferences that there were never any termites in the Banduras' home and that Pearce used scare tactics and deceptive practices to induce the Banduras into purchasing a "preventative" termiticide application. Orkin has done little, both at trial and on appeal, to rebut the logical inferences raised in the evidence presented. At trial, Orkin presented neither Pearce, the salesman who engaged in the alleged deception, nor Roger Hanson, the employee who performed the termiticide application at the Banduras' home. On appeal, Orkin merely attempts to recharacterize the facts in its own favor. In any event, we conclude that

the testimony of plaintiff's expert, coupled with the "termite blitz" policy of Orkin, raises a sufficient inference of deception to create a factual dispute on this issue. Viewing this inference in the light most favorable to the Banduras, as required by *Pedrick v. Peoria & Eastern Railway, supra,* we refuse to conclude that the evidence so overwhelmingly favors Orkin that a verdict in favor of the Banduras could not stand. Thus, under Illinois law entry of either directed verdict or judgment notwithstanding the verdict would be improper. As the trial judge aptly stated:

"A reasonable jury could have inferred from the totality of the evidence and the demeanor of the witnesses that Orkin attempted to sell its services by instilling in plaintiffs the fear of a nonexistent termite infestation. The evidence hardly compelled this conclusion, but such a conclusion was reasonable, and that is the end of the court's inquiry."

As we have in past cases, we again emphasize that it is not the function of the district court to resolve conflicts in testimony or weigh and evaluate the evidence when considering motions for directed verdict and judgment notwithstanding the verdict. Such matters are strictly within the purview of the jury. *See Anderson v. Gutschenritter,* 836 F.2d at 348; *Webb v. City of Chester,* 813 F.2d 824, 827–28 (7th Cir. 1987). We therefore conclude that the Banduras' claim under the Illinois Consumer Fraud and Deceptive Practices Act was properly submitted to the jury and that the evidence supported the jury's finding that the Act had indeed been violated. Accordingly, we affirm the rulings of the district court on Orkin's motions.

### III.

■ It is unnecessary for us to consider Orkin's arguments regarding the sufficiency of the evidence to support the plaintiff's negligence and products liability claims. The jury returned a general verdict in favor of the Banduras. This general verdict was based on the theories of liability sub-

---

**2.** Mud tubes are the underground highway systems that termites build in order to cross rocky areas and other barriers between the soil and a house.

mitted in the jury instructions: negligence, products liability and consumer fraud.[3] We have previously held that the jury's finding of a violation of the ICFDPA was supported in the evidence. Although our previous holding was in the context of the special interrogatories, consumer fraud under the ICFDPA, as well as negligence and product's liability, were pled and submitted as a proximate cause of the plaintiffs' injuries. Our holding on the special finding is equally applicable to the general verdict in the sense that there was sufficient evidence for the jury to reach its verdict based at least in part on the evidence of consumer fraud presented by the plaintiffs. Under Illinois law, it is well settled that where several causes of action have been alleged and a general verdict is returned by the jury, the verdict will be sustained if there is at least one good cause of action to support it. *See Moore v. Jewel Tea Co.*, 46 Ill.2d 288, 263 N.E.2d 103 (1970); *Peterson v. Henning*, 116 Ill.App.3d 305, 72 Ill.Dec. 203, 452 N.E.2d 135 (1983); *Roth v. Meeker*, 72 Ill.App.3d 66, 389 N.E.2d 1248 (1979); *Stark v. D & F Paving Co.*, 55 Ill.App.3d 921, 13 Ill.Dec. 598, 371 N.E.2d 315 (1977). This court has stated a similar rule. *See Cross v. Ryan*, 124 F.2d 883 (7th Cir.1941), *cert. denied*, 316 U.S. 682, 62 S.Ct. 1269, 86 L.Ed. 1755 (1942). Because we have concluded that there was ample evidence in support of the consumer fraud allegations, there is one good cause of action on which to sustain the jury's verdict in favor of the Banduras. We therefore hold that Orkin's arguments that there was insufficient evidence to support the verdict under the negligence and products liability counts of the plaintiffs' complaint are without merit.

## IV.

■ In view of our holding that there was sufficient evidence to support the jury's finding that Orkin violated the Illinois Consumer Fraud and Deceptive Practices Act, we affirm the district court's award of $90,036.66 costs and $208,333.33 fees pursuant to § 10a(c) of the ICFDPA which reads: "In any action brought by a person under this Section, the Court may award, in addition to the relief provided in this Section, reasonable attorneys' fees and costs to the prevailing party." Ill.Rev.Stat. ch. 121½, ¶ 270a(c). The Banduras submitted affidavits verifying costs of $90.036.66 expended in litigating this case and offered the 33⅓ percent contingent fee in the fee agreement between the Banduras and their counsel to justify their request for $208,333.33 in attorneys' fees. The district court, citing *Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir.1986), found that "the best measure of a reasonable attorneys' fee is the prevailing market rate, reflected in the standard contingent fee contract entered into by the parties." We hold that the district court was well within its discretion to make such an award.

■ On appeal, plaintiffs, or more appropriately plaintiffs' counsel, ask for an increase in the amount of attorneys' fees awarded by the district court based on the time expended in responding to Orkin's appeal. Specifically, plaintiffs now ask us to raise the award of fees to 50 percent of the judgment, $312,500, also based on the contingent agreement. The agreement provides that in the event of an appeal, attorneys' fees increase from 33⅓ percent to 50 percent of plaintiffs' recovery. In other words, plaintiffs are asking us to increase the district court's assessment of fees by an additional 16⅔ percent of the judgment, or $104,167. When questioned about this request at oral argument, counsel for plaintiff admitted that "... in hindsight, [he] wouldn't hire a lawyer for 16 percent of $625,000 to do the work [he] did on this appeal." Plaintiffs' counsel also admitted that the issue on appeal, namely whether the evidence was sufficient to support the jury's verdict against Orkin, was not overly complex and that the work on this appeal

---

**3.** Plaintiffs also alleged that their injuries were proximately caused by Orkin's breach of implied warranty of merchantability under the Uniform Commercial Code for Orkin's sale of its termiticide, Orkil. The district court granted Orkin's motion for directed verdict on this theory because there was no evidence that the Orkil would not have worked as it should have had it been properly applied.

consisted primarily of reading the record and writing a brief. Despite these admissions, plaintiffs' counsel argues that we should view the 50 percent figure from the time at which the contract was signed, consider the speculative nature of the case, and assess defendant the additional $104,-167 as a valid indication of the price of legal services for this type of case.

We do not dispute plaintiffs' right to an award of attorneys' fees on appeal under § 10a(c) of the ICFDPA. Such right was specifically recognized by the Appellate Court of Illinois in *Warren v. LeMay*, 142 Ill.App.3d 550, 96 Ill.Dec. 418, 491 N.E.2d 464 (1986). However, we refuse to conclude that $104,167 for reading a record and writing a brief is a valid indication of the price of legal services for this type of an appeal. We therefore grant plaintiff's motion for attorneys' fees on appeal and remand to the district court for a hearing to determine the amount of attorneys' fees that should be awarded for work reasonably performed by plaintiffs' counsel in responding to this appeal.

## V.

We hold that the district court properly denied Orkin's motions for directed verdict, and judgment notwithstanding the verdict and that the jury's general verdict and special findings were supported by sufficient evidence. We also affirm the district court's award in favor of the Banduras for costs and attorneys' fees at trial and grant the Banduras' motion for an award of attorneys' fees on appeal. The district judge, having presided over the complex trial of this case and having previously considered the question of attorneys' fees, is in a better position than we are to determine the amount of work expended on this appeal. Thus, we remand the cause for a determination consistent with this opinion on the amount of attorneys' fees that should be awarded on appeal.

JUDGMENT AFFIRMED; MOTION GRANTED; CAUSE REMANDED.