# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

Patrick J.  Fisher, Jr.                                          Elisabeth A. Shumaker
        Clerk                                                        Chief Deputy Clerk

November 13, 1998


**TO:**   ALL RECIPIENTS OF THE OPINION

**RE:**   96-6399, *Robinson v. City of Edmond*
          Filed on November 6, 1998


Judge Mary Beck Briscoe's concurring/dissenting opinion filed on November 6, 1998, contains a typographical error.  On page four of the concurrence/dissent, seven lines down from the top of the page, the second sentence of the new paragraph should read as follows:

Large Firm typically represents major corporate clients in an array of transactional and litigation matters, including *civil rights* defense.

A corrected copy of page four of the concurrence/dissent is attached.

Sincerely,
Patrick Fisher, Clerk of Court


By:   Keith Nelson
      Deputy Clerk


encl.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 6 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

DR. WAYNE ROBINSON, CURTIS
BATTLES, WENDELL MILLER,
BARBARA ORZA, and MARTIN
FELDMAN,

      Plaintiffs-Appellants,

v.

CITY OF EDMOND, a municipal
corporation, BOB RUDKIN, in his
official capacity as Mayor of the City
of Edmond, CHARLES LAMB, GARY
MOORE, STEVE KNOX, and BARRY
RICE, in their official capacities as
members of the City Council of the
City of Edmond,

      Defendants-Appellees.

No. 96-6399

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-93-153-R)**

---

Micheal C. Salem, of Salem Law Offices, Norman, Oklahoma (Joel L. Carson, of
Carson & Mueller, Oklahoma City, Oklahoma, with him on the briefs), for the
appellants.

Laura Haag McConnell, of Hartzog Conger & Cason, Oklahoma City, Oklahoma
(Stephen T. Murdock, City Attorney for the City of Edmond, Ryan S. Wilson, of
Hartzog Conger & Cason, and V. Burns Hargis, of McAfee & Taft, Oklahoma
City, Oklahoma, with her on the brief), for the appellees.

Before **SEYMOUR,** Chief Judge, **EBEL** and **BRISCOE**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

This appeal arises from a significantly reduced award of attorneys fees in a hard-fought First Amendment case. In this case, by reducing the plaintiffs' fee request almost in half, the district court seriously undermined the important principles at stake in the Civil Rights Attorney's Fees Awards Act, codified at 42 U.S.C. § 1988 (1994). Because the reasons offered by the district court in support of its reduction of the fee request are clearly erroneous, we find that the court has abused its discretion, and we remand for further consideration.

**Background**

This case has wended its way through the courts for more than five years, with multiple disputes over attorneys fees. Because of the complexity of the fees issue here, we must reiterate much of the procedural history of the case even though the facts of the substantive dispute are fully recounted in our 1995 decision. See Robinson v. City of Edmond, 68 F.3d 1226, 1228 (10th Cir. 1995), cert. denied, 517 U.S. 1201 (1996).

This litigation began in 1993 when certain residents and business people of

Edmond, Oklahoma, sued the city and its officials over the city's use of a Latin cross in the city's official seal. Edmond had adopted the seal in 1965 following a competition sponsored by the city and a local newspaper. After almost a generation of use of the Latin cross on city vehicles, city flags, city road signs and city letterheads, the plaintiffs here challenged the city's official seal on the grounds that it infringed their free exercise of religion by endorsing and compelling adherence to the Christian faith and it unconstitutionally established a religion, both in violation of the First and Fourteenth Amendments. The plaintiffs also alleged violations of the religious liberty and non-sectarian clauses of the Oklahoma Constitution, Art. I, § 2 and Art. II, § 5. Bringing suit under 42 U.S.C. § 1983, the plaintiffs sought "nominal actual damages" of at least $25 against each defendant, and declaratory and injunctive relief.

On various motions for summary judgment from the defendants, the district court dismissed the plaintiffs' Free Exercise Clause and related state-constitution claims, as well as the plaintiffs' claims for damages against the city officials in their individual capacities. See Robinson, 68 F.3d at 1228. However, the court scheduled a bench trial for the plaintiffs' Establishment Clause claim against the city and its officials. Following a two-day trial, the court ruled in favor of the defendants, finding that the use of the Latin cross did not violate the Establishment Clause under the test set forth in Lemon v. Kurtzman, 403 U.S. 602

(1971).  See Robinson, 68 F.3d at 1228.

After the district court's judgment, the defendants sought reimbursement from the plaintiffs for the time spent by the city's three private attorneys – $117,083 in attorneys' fees – as well as other costs, under 42 U.S.C. § 1988(b).[1] The district court awarded only a small portion of this request, finding that the plaintiffs' Establishment Clause claim and the related Oklahoma Constitution claim were "not frivolous," but that the Free Exercise Clause claim was "without foundation" because the plaintiffs had conceded in their depositions that they were free to exercise their religion.  On the basis of these findings, the district court awarded the defendants $2,361 in attorneys' fees incurred in defending against the Free Exercise claim.[2]

The plaintiffs first appealed the district court's substantive decision on the Establishment Clause claim, and they subsequently filed a second appeal of the attorneys' fees order.  The plaintiffs did not appeal the district court's summary judgment on the Free Exercise claim or the dismissal of claims against city leaders in their individual capacities.  Both appeals were consolidated in a single

[1]The defendants sought reimbursement for 951.15 hours of work by the three attorneys and a paralegal at Hartzog Conger Cason & Hargis, at varying rates of $190/hour, $130/hour, and $115/hour.

[2]The court awarded reimbursement for 20.1 hours by two attorneys over one month, work that dealt solely with preparation of the summary judgment motion on the Free Exercise claim.

- 4 -

decision, in which we reversed the trial court. See Robinson, 68 F.3d at 1228. We concluded that under Lemon v. Kurtzman and its progeny, the city's use of the Latin cross conveyed a message that a particular religious belief was preferred. See id. at 1232-33. As a result, we found that the city's official seal violated the Establishment Clause. See id. In light of this conclusion, we held that the plaintiffs were prevailing parties under 42 U.S.C. § 1988(b), and we remanded the district court's award of attorneys' fees for "a redetermination." See id. at 1233.

The defendants petitioned for a writ of certiorari, which was denied over a dissent by Chief Justice Rehnquist, joined by Justices Scalia and Thomas. See City of Edmond v. Robinson, 517 U.S. 1201 (1996). In his dissent, the Chief Justice said there was an important circuit split over the question of whether religious symbols in a municipal seal violated the Establishment Clause. See id. (Rehnquist, C.J., dissenting). Furthermore, the Chief Justice argued that this case presented an important question of standing in the context of an Establishment Clause claim, which the Tenth Circuit's opinion had not addressed. See id. at 1202-03 (Rehnquist, C.J., dissenting).

On remand, the district court awarded the plaintiffs nominal damages of $1 against each defendant, and the court entered a permanent injunction barring the use of the Latin cross in the city's official seal. The plaintiffs also submitted an

application for their attorney's fees under 42 U.S.C. § 1988(b). The plaintiffs requested $186,008.75 in attorney's fees and $3,150.80 in litigation expenses.[3] In support of this request, the plaintiffs attached billing records showing that Michael C. Salem, the plaintiffs' lead attorney, had discounted his hours by 7.7 percent, leading to a total request for 1,048.4 hours at an hourly rate of $175 per hour.[4] The plaintiffs also requested reimbursement for nearly 33.85 hours of time spent by a law clerk in Salem's office, at $75 per hour.

The defendants generally objected to this fee request as unreasonable, but they specifically articulated objections to only $43,732.50 of the fee request, leaving $142,276.25 in requested attorney's fees not separately contested. In response to the defendants' contention that the plaintiffs' attorney had engaged in "block-billing," the plaintiffs submitted the individual time slips for Salem, recounting the specific tasks he worked on each day and how much time he allotted to each task.

The district court rendered a total award under § 1988(b) of $105,720.89,

---

[3]The plaintiffs also requested the taxing of $6,766.66 as costs. After the defendants objected to most of these costs, the clerk of the district court taxed $4,843.99 against the defendants. Neither party has appealed this decision, and thus, the amount of taxable costs is not before us.

[4]In all, plaintiffs' attorney discounted 33.5 hours from his time for the fee request, 15.5 hours from his time for legal research, 14.5 hours from his time for drafting, 12.9 hours from his time reviewing files and other documents, and 10.8 hours from his time for travel and meeting with clients.

which was well below the amount the defendants had left uncontested.[5]  The court said it had no doubt that Salem actually had worked all of the hours he claimed, and the court did not dispute his hourly rate of $175, although the court reduced the hourly rate of Salem's legal assistant, Vincent J. Liesenfeld.  The court also found that the plaintiffs' various claims were "interrelated, . . . nonfrivolous, and asserted in good faith," and that the degree of success achieved by the plaintiffs "was great."  Nevertheless, the court said the plaintiffs' claim for 1,048.4 hours was unreasonable in light of the court's conclusion that this "was a fairly simple, straightforward lawsuit."  The court added that it felt the amount of hours expended was excessive because of the plaintiffs' "only partial success." Furthermore, responding to the plaintiffs' argument that their fee request was reasonable in comparison to the amount of hours that had been claimed by the defendants in the defendants' earlier aborted fee request, the court held that the alleged hours expended by the defendant were also unreasonable if they were as large as asserted, and thus, defendants' hours would not provide support for plaintiffs' request.  Finally, without any reference to the supplemental filing from

---

[5]The court itemized its award by including 576.62 hours of attorney time, at $175/hour ($100,908.50), 33.85 hours of law clerk time at $50/hour ($1,692.50), and $2,760.86 for non-taxable litigation expenses.  The total for this itemization is actually $105,361.86.  It is unclear what accounts for the additional $359.03 in the court's award.  However, none of the parties has raised this apparent mathematical error.

the plaintiffs that provided evidence of the detailed billing records for Salem, the court contended that Salem's use of "block-billing" had rendered it impossible for the court "to precisely identify the hours which were excessive and duplicative." As a result of these findings, the district court applied an across-the-board cut of 45 percent in the hours claimed by the plaintiffs' attorney, reducing his compensation from 1,048.4 hours to 576.62 hours, and it reduced the hourly fee for the plaintiffs' law clerk from $75/hour to $50/hour.

The plaintiffs now appeal that portion of the fee award reducing the amount of hours claimed by the plaintiffs' lawyer.[6] We reverse and remand.

## I. Attorney's Fees under 42 U.S.C. § 1988(b)

The Civil Rights Attorney's Fees Awards Act allows a prevailing party in a civil rights case, including suits brought under 42 U.S.C. § 1983, to seek reimbursement for his attorney's fees, to the extent the fees are reasonable. See 42 U.S.C.A. § 1988(b) (West Supp 1998.).[7] Although the power to award such

---

[6] The plaintiffs have not contested the reduction in hourly rate for their law clerk or the reduction in non-taxable litigation expenses. Therefore, those items of the fee award are not before us.

[7] The relevant text of this statute is as follows,

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983 [etc.] . . . of this title . . . , the court, in its discretion, may allow the

(continued...)

fees is discretionary, that discretion is narrow once a civil rights plaintiff demonstrates that he is a "prevailing party." See Phelps v. Hamilton, 120 F.3d 1126, 1129 (10th Cir. 1997). The implication of our cases is that when a plaintiff prevails in a civil rights suit, the plaintiff ordinarily should not have his vindication of these rights eviscerated by an obligation to pay his attorney's reasonable fees.

In light of the discretionary nature of the district court's decision, we review an attorney's fee award under 42 U.S.C. § 1988(b) for an abuse of discretion. See Phelps, 120 F.3d at 1129. This standard of review applies to both the court's decision to award fees in the first place and the court's determination of the amount of fees to be awarded. See Joseph A. ex rel. Wolfe v. New Mexico Dep't of Human Servs., 28 F.3d 1056, 1058-59 (10th Cir. 1994). Under this standard, we may reverse a district court's underlying factual findings only if they are clearly erroneous, but we review the court's statutory interpretation or other legal conclusions de novo. See Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1996). Finally, contrary to the defendants' assertion in this appeal, the determination of what constitutes a "reasonable" fee amount is not a factual

---

[7](...continued)
>prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988(b).

finding insulated by the clear-error standard, but rather, the reasonableness

determination is a mixed fact-law application which is itself subject to the general

abuse-of-discretion standard.  See id. at 1510 (holding that the abuse-of-discretion

standard applies to a district court's determination of an attorney's "reasonable

hours" and "reasonable hourly rate"); Smith v. Freeman, 921 F.2d 1120, 1122

(10th Cir. 1990); Lucero v. City of Trinidad, 815 F.2d 1384, 1386 (10th Cir.

1987); Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1201 (10th Cir. 1986);

Ramos v. Lamm, 713 F.2d 546, 556 (10th Cir. 1983).

In any fee request under § 1988(b), a claimant must prove two elements:

(1) that the claimant was the "prevailing party" in the proceeding; and (2) that the

claimant's fee request is "reasonable."  See Hensley v. Eckerhart, 461 U.S. 424,

433 (1983); Phelps, 120 F.3d at 1129.  In this case, there is no question that the

plaintiffs were the prevailing party – we held as much in our earlier reversal of

the district court's first decision.  See Robinson, 68 F.3d at 1233.  Thus, the only

question in this case is whether the plaintiffs established that their fee request was

"reasonable."

To determine the reasonableness of a fee request, a court must begin by

calculating the so-called "lodestar amount" of a fee, and a claimant is entitled to

the presumption that this lodestar amount reflects a "reasonable" fee.  See

Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546,

563-65 (1986); <u>Cooper v. Utah</u>, 894 F.2d 1169, 1171 (10th Cir. 1990).  The lodestar calculation is the product of the number of attorney hours "reasonably expended" and a "reasonable hourly rate."  <u>See</u> <u>Hensley</u>, 461 U.S. at 433; <u>Phelps</u>, 120 F.3d at 1131.  "Once an applicant for a fee has carried the burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be a reasonable fee as contemplated by Section 1988."  <u>Cooper</u>, 894 F.2d at 1171.

In this appeal, the only issue in contention is the reasonableness of the hours expended by the plaintiffs' attorney.  This subsidiary reasonableness inquiry is controlled by the overriding consideration of whether the attorney's hours were "necessary" under the circumstances.  "The prevailing party must make a 'good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.'" <u>Jane L.</u>, 61 F.3d at 1510 (quoting <u>Hensley</u>, 461 U.S. at 434)).  A district court should approach this reasonableness inquiry "much as a senior partner in a private law firm would review the reports of subordinate attorneys when billing clients . . . ." <u>Ramos v. Lamm</u>, 713 F.2d 546, 555 (10th Cir. 1983).  However, "[t]he record ought to assure us that the district court did not 'eyeball' the fee request and cut it down by an arbitrary percentage . . . ." <u>People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205</u>, 90 F.3d 1307, 1314 (7th Cir. 1996) (quotations omitted).

The Ramos court suggested that among the factors to be considered were (1) whether the tasks being billed "would normally be billed to a paying client," (2) the number of hours spent on each task, (3) "the complexity of the case," (4) "the number of reasonable strategies pursued," (5) "the responses necessitated by the maneuvering of the other side," and (6) "potential duplication of services" by multiple lawyers. Id. at 554. As part of this reasonableness determination, a district court may discount requested attorney hours if the attorney fails to keep "meticulous, contemporaneous time records" that reveal "all hours for which compensation is requested and how those hours were allotted to specific tasks." Id. at 553.

In this analysis, we ask what hours a reasonable attorney would have incurred and billed in the marketplace under similar circumstances. "In other words the object is to simulate the market where a direct market determination is infeasible." Steinlauf v. Continental Illinois Corp., 962 F.2d 566, 572 (7th Cir. 1992). As Congress noted when it enacted the fee-shifting provision in section 1988(b), the purpose behind this measure was not to give private lawyers an unwarranted windfall, but rather to ensure compensation "adequate to attract competent counsel." See S. Rep. No. 94-1011, at 6 (1976), reprinted in 1976 U.S.C.C.A.N. 5908, 5913, quoted in Homeward Bound, Inc. v. Hissom Mem'l Ctr., 963 F.2d 1352, 1355 (10th Cir. 1992). It goes without saying that if a

court's compensation is not adequate to match what the market will bear for a lawyer's services, then competent lawyers will go elsewhere to offer their services. Such a result would do irreparable damage to our system of private enforcement of federal civil rights.

### A. Simplicity of the case.

In the instant case, the district court offered several justifications for its reduction of the plaintiffs' fee request, but at oral argument on appeal the defendants were willing to stand behind only one of those rationales: that this case was "simple." At the heart of the district court's downward adjustment lies the court's contention that "[t]his was a fairly simple, straightforward lawsuit." The court concluded that nothing about the nature or history of the case "could reasonably justify the number of hours expended by Plaintiffs' counsel" because the case "was virtually a single-issue one."

The court's characterization of this case as "fairly simple" seems to derive in large part from the fact that the plaintiffs' suit arose out of a single, easily observed and quickly understood fact – the city was displaying a religious symbol in its official seal. This single fact, however, generated reams of legal analysis in a case that highlighted an important circuit split and tempted three Supreme Court justices to grant certiorari to hear it. See City of Edmond v. Robinson, 517 U.S.

1201, 1201 (1996) (Rehnquist, C.J., dissenting from denial of certiorari).  During the pre-trial phase of this case, there were three separate motions for summary judgment as well as a motion to dismiss, each with response briefing.  There were amici briefs from two separate interest groups, the Christian Legal Society of Oklahoma and Citizens for Keeping the Cross.  There were discovery battles that led to motions to compel production, to strike experts, and to limit testimony, with response briefing on each.  There were depositions of all parties, including a two-day deposition of the lead plaintiff.  And, the trial itself took two full days. After the initial trial, the plaintiffs had to defend against three separate applications for attorneys fees filed by the defendants, as well as an application to tax costs.  On appeal, this case focused on a difficult circuit split between the Fifth and Seventh Circuits on the question of religious symbols in municipal seals.  See Harris v. City of Zion, 927 F.2d 1401 (7th Cir. 1991); Murray v. City of Austin, 947 F.2d 147 (5th Cir. 1991).  Furthermore, there were competing precedents on the issue within the Tenth Circuit itself.  Compare Foremaster v. City of St. George, 882 F.2d 1485, 1491 (10th Cir. 1989) (holding that it was an open factual question, which couldn't be resolved on summary judgment, as to whether the illustration of the St. George LDS temple in the city's seal had the primary effect of endorsing the LDS Church) with Friedman v. Board of County Comm'rs, 781 F.2d 777, 778, 781-82 (10th Cir. 1985) (holding that the official

seal of Bernalillo County, with a Latin cross and the Spanish motto "CON ESTA VENCEMOS," violated the Establishment Clause). As noted above, the split between the circuits became part of the basis for a dissent from the Supreme Court's denial of certiorari in this case. See Robinson, 517 U.S. at 1201, 1202-03 (1996) (Rehnquist, C.J., dissenting).

This procedural history unequivocally demonstrates that this case was far from "simple." It was a case in which thoughtful jurists strongly disagreed. Besides the central legal issues under the Establishment Clause – an area notorious for its difficult case law – the case also involved a host of ancillary issues: individual liability of municipal officials, qualified or absolute immunity for municipal legislators, standing under Article III for plaintiffs to raise Establishment Clause claims, scope of Free Exercise rights in the context of facially non-coercive municipal conduct, attorney-client confidentiality for engagement letters, and use of experts to gauge public perceptions of religious symbols.

In this context, the district court's findings – that the case was "fairly simple" and that it would have been unreasonable for plaintiffs sole counsel to have spent anything more than eleven weeks of his time on this case (at 50 hours a week) from start to finish – are clearly erroneous. Because these findings undergird the whole of the district court's decision to reduce the plaintiffs' fee

request, the error on these findings requires us to reverse and remand the lower court's judgment. We next address briefly the court's other rationales for its downward adjustment.

## B. Partial success.

Although the district court noted that the plaintiffs had prevailed in their principal goal of removing the Latin cross from the city's official seal, the court nevertheless found that the plaintiffs had "achieved only partial success." The court appears to have concluded that it should exclude all of the plaintiffs' attorney hours associated with three unsuccessful claims: the Free Exercise Clause claim, the claim for individual-capacity liability against the city officials, and the claim for actual damages beyond merely nominal damages. This conclusion, however, is legally indefensible in light of the fact that all of the unsuccessful claims were intertwined with the successful claims through a common core of facts or related legal theories.

There is no doubt that a district court may reduce a lodestar calculation on the grounds that a prevailing party has achieved only partial success. See Hensley, 461 U.S. at 436-37; Jane L., 61 F.3d at 1510. However, as the Court noted in Hensley, many civil rights suits involve multiple claims based on "a common core of facts or . . . related legal theories." Hensley, 461 U.S. at 435. In

such cases, it is inappropriate for a district court to evaluate the individual claims as though they were discrete and severable. Litigants should be given the breathing room to raise alternative legal grounds without fear that merely raising an alternative theory will threaten the attorney's subsequent compensation. Instead, a court should focus on the "significance of the overall relief" that the prevailing party has won: "The result is what matters." Id.

We have applied the teaching of Hensley to reverse a district court's reduction of attorney's fees for a plaintiff who prevailed on a part of her Equal Pay Act claim but failed on her Title VII claims – the facts supporting the plaintiff's unsuccessful claims were part of "one bundle of proof" with the successful one, and thus the plaintiff's attorney was "entitled to be fully compensated." See Tidwell v. Fort Howard Corp., 989 F.2d 406, 412-13 (10th Cir. 1993). Similarly, in another case we found that various legal theories offered by plaintiffs in a challenge against a Utah waiting period for abortions were all interrelated, and as a result, success on the basis of one theory would require attorney compensation for all the related theories. See Jane L., 61 F.3d at 1512. Finally, in one of our most recent attorney's fees cases, we rejected a Title VII defendant's appeal calling for a reduction in a fee award granted to the plaintiff because we found that the plaintiff's unsuccessful state-law contract and emotional distress claims were all "intimately related" to her successful Title VII

hostile work environment claim.  See Smith v. Northwest Fin. Acceptance, Inc.,

129 F.3d 1408, 1418-19 (10th Cir. 1997).

These cases demonstrate that when a plaintiff achieves the principal goal of

her lawsuit, lack of success on some of her interrelated claims may not be used as

a basis for reducing the plaintiff's fee award.  When a plaintiff achieves most or

all of what she aimed for in a civil rights lawsuit, her lawyer should receive "a

fully compensatory fee."  Hensley, 461 U.S. at 435.  As the Court said in Hensley,

"the most critical factor is the degree of success obtained."  Id. at 436.

In the instant case, it was clear from the very start of litigation that the

plaintiffs' principal goal was the removal of the religious emblem from the city's

seal.  The plaintiffs suggested as much in their complaint when their only request

for money damages sought an amount of "not less than $25.00 . . . for  nominal

actual damages."  Although it is not entirely clear whether this demand should be

read as requesting actual damages or nominal damages or both, it is clear that

monetary relief was not a principal aim of the suit.  As a result, when the

plaintiffs won a permanent injunction requiring the removal of the Latin cross

from Edmond's official seal, as well as nominal damages of $1 against each

defendant, they won virtually everything that they sought.

Furthermore, those claims that were unsuccessful for the plaintiffs were all

"related" because they involved a common core of facts as well as closely linked

legal theories. All of the claims in this case arose out of the single fact of the city's use of a religious emblem in its official seal, and both the state-constitutional claims and the First Amendment claims tracked the same body of law.

There is no doubt that, as the Court said in Hensley, a fee request may be reduced when some of a plaintiff's interrelated claims are unsuccessful. See Hensley, 461 U.S. at 436-37. But, Henlsey made it abundantly clear that failure on some interrelated claims is not nearly as important a factor as the "overall relief" obtained by the plaintiff. See id. at 435. As we said in Jane L., when a plaintiff relies on interrelated claims in support of a single outcome, failure on some of those claims does not preclude a full recovery when the plaintiff achieves the outcome that she sought. See Jane L., 61 F.3d at 1512. Hensley establishes that what matters is the result, and in the instant case, the "result" for the plaintiffs was complete vindication. In this context, it was legally incorrect for the district court to reduce the plaintiffs' fee request on the basis of the plaintiffs' "only partial success" for their interrelated claims.

## C. Comparison with opponent's attorney hours.

The district court was similarly unpersuaded by the plaintiffs' attempt to justify their hours expended by comparing that figure to the number of hours

expended by the defendants' lawyers. The court stated that if the defendants actually had expended anywhere near the number of hours of attorney time as suggested by the plaintiffs,[8] then the amount of the defendants' hours was simply "more unreasonable" and it could not be used to "transmute the amount of time spent by Plaintiffs' counsel into something reasonable."

The Tenth Circuit has long accepted the proposition that one of the factors useful in evaluating the reasonableness of the number of attorney hours in a fee request is "the responses necessitated by the maneuvering of the other side." Ramos, 713 F.2d at 554. The Supreme Court has also recognized that part of an attorney's calculus of the amount of time reasonably necessary for a case is the vigor which the opponents bring to the dispute. See City of Riverside v. Rivera, 477 U.S. 561, 580 n.11 (1986) (plurality opinion) ("'The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.'") (quoting Copeland v. Marshall, 641 F.2d 880, 904 (D.C. Cir. 1980)); see also 2 Mary Francis Derfner & Arthur D. Wolf, Court

---

[8]In their application for a fee award, the plaintiffs pointed out that in the defendants' original fee request following the bench trial, the defendants claimed that their three private attorneys worked 951 hours. The plaintiffs then cited newspaper accounts of the city's litigation since the bench trial and estimated that the city's private attorneys have worked an additional 700 hours. The plaintiffs contended that the fact the defendants' attorneys had spent at least 500 hours more than their attorney supported their argument that Salem's time was reasonable.

Awarded Attorney Fees, ¶ 16.02[8][b] (1997) (discussing cases that have held "the vehemence or tenacity of the opposition will justify an increase in the amount of time an attorney must necessarily – and therefore reasonably – spend in countering the opposition and winning the suit").

The evidence of the hours expended by defense counsel is not, of course, an immutable yardstick of reasonableness, and it may be disregarded or discounted as a comparative factor if found to be unreasonable in its own right. However, here the effort expended by the defendants suggests at least that they viewed the case as sufficiently complex and serious to warrant the expenditure of large amounts of attorney time, and it highlights the tooth-and-nail litigating approach the city used in this case. In light of this tenacious effort by the city and its lawyers, the amount of attorney time expended by the plaintiffs begins to look more reasonable, not less.

**D. Use of "block-billing."**

In its decision, the district court quite appropriately expressed concern about the use of "block billing" practices.[9] The use of billing practices that

---

[9]The term "block billing" refers to "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1554 n.15 (10th Cir.), cert. denied,

(continued...)

- 21 -

camouflage the work a lawyer does naturally and quite correctly raise suspicions about whether all the work claimed was actually accomplished or whether it was necessary. This concern is particularly important in a situation where a party is seeking to have his opponent pay for his own lawyer's work. As we noted in Jane L., a district court does not abuse its discretion in reducing a plaintiff's fee request when the request is based on time records that are "rather sloppy and imprecise." Jane L., 61 F.3d at 1510. We have always required lawyers to keep "meticulous time records that 'reveal . . . all hours for which compensation is requested and how those hours were allotted to specific tasks.'" Id. (quoting Ramos, 713 F.2d at 553).

In this case, however, the record before us demonstrates that the district court clearly erred when it found that the plaintiffs' lawyer had engaged in "block billing." In their initial application for attorney's fees, the plaintiffs submitted billing statements from their lawyer that itemized what tasks he performed in the case on each day, with a total amount of time billed for each day. The summaries of the tasks are quite specific, and they go beyond the kind of imprecision we criticized in Jane L. It is true, however, that these billing statements do not allocate the precise amounts of time spent on each particular task during each

[9](...continued)
117 S. Ct. 297 (1996).

individual day. However, in their response to the defendants' objection to the fee request, the plaintiffs supplemented these billing statements with copies of the actual contemporaneous time slips that were the basis of the billing statements. These time slips do include the specific amounts of time allocated to each individual task.

On the basis of these records, it is clear that the plaintiffs' lawyer did not engage in "block billing." If the district court is concerned about identifying certain tasks that it felt were redundant or unnecessary, it had information sufficient to calculate how much time was spent on those tasks. Thus, the court's contention that it was "not possible" to identify which hours were "excessive or duplicative"[10] is not supported by the record. On the other hand, the district court

---

[10]We do not understand the district court's reference to "duplicative" time because there were no other lawyers for whom the plaintiffs submitted a fee request. The term "duplicative" in the context of attorney's fees requests usually refers to situations where more than the necessary number of lawyers are present for a hearing or proceeding or when multiple lawyers do the same task. See Ramos, 713 F.2d at 554 ("The more lawyers representing a side of the litigation, the greater the likelihood will be for duplication of services."). In a case where only one lawyer is billing for his time, it is highly improbable that there will be any "duplication" of services, in this sense of double billing. Instead, the only kind of "duplication" that might occur would be when the lawyer repeats the same task unnecessarily. Our own review of the time sheets submitted by the plaintiffs for their lawyer has failed to reveal any such repetition of unnecessary tasks.

Furthermore, because all the claims here are interrelated and the plaintiffs secured all the relief they requested, it is not necessary that the court be able to break down the hours between the various claims. That, of course, will not always be the case and prudent counsel would therefore be well advised to keep

(continued...)

might properly be concerned about the difficulty of performing a meaningful analysis given the mass of records submitted to it.  On remand, the district court may quite properly impose on the claimant the burden of organizing or summarizing the billing records in such a manner as to facilitate judicial review of the reasonableness of the claim for attorneys' fees.[11]

### E.  Defendants' failure to challenge portion of requested fee.

The court's award dropped the fee request from the $186,008.75 presented by the plaintiffs, and the $140,316.25 left uncontested by the defendants, to $105,720.89.  The end result was a fee award that was nearly 25 percent below the unrebutted amount of the plaintiffs' fee request (and 43 percent below the original plaintiffs' request).

---

[10](...continued)
records reflecting the time that is uniquely allocated to a particular claim if that claim is distinct and severable from others being asserted.

[11]District courts do not necessarily have to "wade through [a litigant's] voluminous time records to rescue the compensable time from the sea of non-compensable time."  In re Central Ice Cream Co.  , 836 F.2d 1068, 1074 (7th  Cir. 1987).  Unfortunately, prevailing attorneys occasionally support the reasonableness of their fee application by dumping a pile of timesheets on their adversary and the court for analysis.  In such a scenario, the district court is free to "require the submitting party to organize the time material in a meaningful way with a comprehensive summary so that the material is understandable and easily reviewable."  FMC Corp. v. Varonos  , 892 F.2d 1308, 1316 (7th  Cir. 1990).  If the applicant does not properly respond to the court's directive, a denial of fees may be appropriate.  Id. at 1317.

Of course, there is no question that a district court may rely on its general experience as well as its closer familiarity with a case to evaluate the parties' arguments on a fees issue. See Bee v. Greaves, 910 F.2d 686, 689 (10th Cir. 1990). In this respect, a district court may well decide to go below the amount of a fee request put in controversy by the parties – in this sense, the court's discretion is not absolutely constrained by the amount of a fee request put in controversy by the parties. But cf. Cunningham v. City of McKeesport, 753 F.2d 262, 267 (3d Cir. 1985) (holding that under the Third Circuit's approach, a district court has no reason to disregard uncontested affidavits filed by the fee applicant when the defendant chose not to put those amounts in controversy), vacated 478 U.S. 1015 (1986), reinstated after remand, 807 F.2d 49 (3d Cir. 1986). However, the fact that the district court here chose to depart significantly from the unchallenged portion of the plaintiffs' fee request, and did so only by applying a blanket reduction ratio, is a factor to consider in deciding whether the district court abused its discretion in the magnitude of the cuts ordered.

## II. Hearing on fees request

As an independent challenge to the district court's decision, the plaintiffs contend that the court abused its discretion by failing to hold an evidentiary hearing on the attorneys fees issue and then relying on a rationale – i.e. the "fairly

simple" nature of the case – that was not articulated in the defendants' briefs. This claim has no merit because the plaintiffs have been unable to point to any indication in the record that they requested a hearing. Ordinarily, a district court does not abuse its discretion in deciding not to hold an evidentiary hearing when no such request is ever made. Furthermore, many courts have long accepted the proposition that there is no need for an evidentiary hearing in a attorney's fees case when a record has been fully developed through briefs, affidavits, and depositions. See Derfner & Wolf, supra, ¶ 18.06[4][a] (collecting cases).

In this case, the plaintiffs have failed to show that any new information they would have presented at the hearing would have been critical to the district court's consideration.[12] A district court does not abuse its discretion when it fails to hold a hearing at which the parties will simply reiterate arguments they already have made in their briefs.

The case relied upon by the plaintiffs for their argument on this point is inapposite. See Michael A. Cramer, MAI, SPRA, Inc. v. United States, 47 F.3d 379, 380-81 (10th Cir. 1995). The Cramer case involved a decision by a district court to deny a fee request just three days after the defendant had filed its

_____

[12]The only additional evidence the plaintiffs say they would have presented are copies of the briefs they filed in their appeal and the petition for certiorari. Beyond this evidence, they suggest only that a hearing would have provided them an opportunity to explain "the overall reasonableness" of their request.

opposition to the request and before the plaintiff had a chance to respond to the defendant's arguments.  Id.  In that posture, we held that the district court's failure to supplement the record was an abuse of discretion.  See id. at 384.  We do not have a similar problem in this case because the record the parties created was quite adequate to resolve the fees issue.

## Conclusion

We REVERSE and REMAND.  On remand, the district court should redetermine a reasonable attorney's fee under 42 U.S.C. § 1988(b) consistent with this opinion.

No. 96-6399, <u>Robinson v. City of Edmond</u>

**BRISCOE**, Circuit Judge, concurring and dissenting:

Subject to certain caveats, I concur with the majority that the district court erred in (1) finding plaintiffs' attorney engaged in improper "block billing," and (2) reducing plaintiffs' attorney fees based on their "partial success." I also agree that the district court properly declined to conduct an evidentiary hearing on plaintiffs' attorney fee application. In all other respects, however, I must dissent.

<u>I. Legal Standards</u>

My initial concern with the majority's opinion is the standard of review it invokes in reviewing the district court's award of attorney fees. The majority correctly observes a district court's determination of reasonable attorney fees is reviewed under an abuse of discretion standard and its subsidiary factual findings will be reversed only if clearly erroneous. See <u>Mares v. Credit Bureau of Raton</u>, 801 F.2d 1197, 1201 (10th Cir. 1986). The majority then suggests, however, that "the determination of what constitutes a 'reasonable' fee amount is not a factual finding insulated by the clear-error standard, but rather, the reasonableness determination is a mixed fact-law application which is itself subject to the general abuse-of-discretion standard." Majority Op. at 10. This new standard has no precedential authority and is contrary to the law of this circuit.

Although statutory interpretations and legal conclusions underlying an attorney fee award are subject to de novo review, <u>Phelps v. Hamilton</u>, 120 F.3d

1126, 1129 (10th Cir. 1997), the assessment of the reasonableness of an attorney

fee request entails no such legal analysis.  To the contrary, the reasonableness

inquiry is ordinarily a pure question of fact reviewed for clear error.[1]  United

States v. Hardage, 985 F.2d 1427, 1436-37 (10th Cir. 1993); American Ins. Co. v.

El Paso Pipe & Supply Co., 978 F.2d 1185, 1194 (10th Cir. 1992).[2]  A district

court's reasonableness determination, therefore, is "reversible only if it is without

---

[1]The standard by which a district court calculates an attorney fee award, of course, is an issue of law reviewed de novo.  See Beard v. Teska, 31 F.3d 942, 955-57 (10th Cir. 1994) (holding district court's decision to fashion hourly rate in amount significantly higher than undisputed prevailing local market rate was a legal matter subject to de novo review; relevant issue was the proper legal standard– "prevailing market rate" versus "normal billing rate"--not the mere reasonableness of the award).  Similarly, the district court's purely discretionary decisions–e.g., adjusting the loadstar, denying fees altogether for conscience-shockingly excessive requests, and awarding fees above local market prevailing rates to non-local counsel determined to be necessary for the case–are reviewed solely for an abuse of discretion.

Regrettably, we often have taken an analytical shortcut in describing the standard of review for attorney fee awards.  In such cases, we have lumped together all components of our review into a general abuse of discretion standard. The cases cited by the majority highlight this deficiency.  Nevertheless, assuming the proper legal standards have been applied, the appropriate manner for examining a district court's reasonableness inquiry is to treat the court's findings as factual issues and examine them for clear error.  See United States v. Hardage, 985 F.2d 1427, 1436-37 (10th Cir. 1993); accord Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1047 (5th Cir. 1998); Dague v. City of Burlington, 976 F.2d 801, 803 (2d Cir. 1991); Leffler v. Meer, 936 F.2d 981, 984-85 (7th Cir. 1991); Black Grievance Comm. v. Philadelphia Elec. Co., 802 F.2d 648, 652 (3d Cir. 1986), vacated on other grounds, 483 U.S. 1015 (1987).

[2]  Although Hardage and El Paso Pipe involved attorney fee awards based on state law, the standard of appellate review applied to awards made pursuant to federal fee-shifting statutes is the same.

factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." Hardage, 985 F.2d at 1436-37 (citation omitted). Although judges are not unanimous in their concepts of reasonableness, the need for uniformity in attorney fee awards is not so great as to justify "microscopic appellate scrutiny." Estate of Borst v. O'Brien, 979 F.2d 511, 514 (7th Cir. 1992); see also Trimper v. City of Norfolk, 58 F.3d 68, 74-75 (4th Cir. 1995) (appellate court's role in achieving uniformity is limited in attorney fee context by need to accord substantial deference to district court's factual findings of reasonableness).

The majority articulated the proper legal standard for calculating a reasonable attorney fee in a statutory fee-shifting context. "[W]e ask what hours a reasonable attorney would have incurred and billed in the marketplace under similar circumstances." Majority Op. at 9. Unfortunately, the majority then injected a degree of confusion into the mix by theorizing the objective in calculating the fee "is to simulate the market where a direct market determination is infeasible." Id. at 10 (quoting Steinlauf v. Continental Ill. Corp., 962 F.2d 566, 572 (7th Cir. 1992). In Steinlauf, a common fund case in which scores of attorneys sought reimbursement for fees generated in the pursuit of a securities class action taken on contingency, the court reasoned that district courts should "determine what the lawyer would receive if he were selling his services in the

market rather than being paid by court order." 962 F.2d at 568. This framework cannot be employed in a *civil rights* statutory fee-shifting context. Such a theory would invite attorneys who normally command fees far in excess of the standard market rate for civil rights representation to bill at an inordinately high rate. More importantly, it would deprive district courts of broad discretion to make reductions for excessive billings.[3]

The following hypothetical underscores the problem. Large Firm typically represents major corporate clients in an array of transactional and litigation matters, including *civil rights* defense. Large Firm bills its clients at $250/hour. Although Large Firm often utilizes "scorched earth" approach in litigation, clients willingly pay all bills because of the firm's high success rate. For a variety of reasons, Large Firm decides to take individual plaintiff's civil rights case. Large Firm prevails and seeks, on behalf of its client, $250,000 in attorney fees, reflecting 1,000 hours of work at $250/hour. Despite the fact that hundreds of local civil rights attorneys could have performed similar work for half the price in half the hours, Large Firm arguably would be entitled to its full request under the Seventh Circuit's approach inasmuch as the firm's attorneys are able to command

---

[3]The dilemma is illuminated further by the Seventh Circuit's apparent rejection of an abuse of discretion standard of review in favor of a stricter and more amorphous "deferential standard." Steinlauf, 962 F.2d at 568.

such fees in the open market.  See Steinlauf, 962 F.2d at 569.  That, however, is not the law in this circuit.  As we explained in Beard v. Teska, 31 F.3d 942, 956 (10th Cir. 1994):

> [J]ust as lawyers are not fungible, so too legal services are not fungible.  It will be recalled that the legal standard for fee awards is a prevailing market value test.  And for that purpose the relevant market value is not the price that the particular lawyer chosen may be paid by willing purchasers of his or her services, but rather the price that is customarily paid in the community for services like those involved in the case at hand.
>       Only a moment's thought is need[ed] to see why that is so in the context of fee awards against an adversary.  There are of course different markets for different areas of lawyer's work.  Lawyers who handle home closings do not bill or receive payment at the same hourly rate as lawyers who handle major corporate mergers and acquisitions–even though each may be handling a "purchase."  If the home buyer chooses to retain a merger specialist because the buyer wants to take advantage of the latter's demonstrated negotiating skills, the buyer of course is free to do so and to pay the higher tariff.  But if and when it comes down to fee shifting–to imposing on the other side an obligation to pay the lawyer's fee for a legally sufficient reason–the higher cost of the merger specialist cannot properly be thrust on someone who did not, after all, make the uneconomic choice of counsel.

Fee-shifting statutes entitle prevailing litigants to a "reasonable"[4] attorney fee,

---

[4]The term "reasonable" in the calculation of statutory attorney fees is problematic.  As one district judge recently noted in the hourly rate context, the phrase

> seems to imply that, by definition, any other rate actually charged to a client is somehow unreasonable or unfair.  That, of course, is not the case.  The factors that go into the setting of rates by attorneys are likely to differ based on numerous considerations, and private parties are certainly entitled to strike whatever bargain on rates that proves

(continued...)

- 5 -

sufficiently "adequate to attract *competent* counsel."  Homeward Bound, Inc. v.

Hissom Mem'l Ctr., 963 F.2d 1352, 1355 (10th Cir. 1992) (emphasis added).

Such statutes do not permit an award of fees charged by "the best attorneys that

money can buy" if those rates exceed the prevailing market rate for similar

services.

The majority's reasoning might ring truer if this case involved a contract-

based attorney fee award.  Such awards are designed to make prevailing parties

whole and the district court's role in scrutinizing the fee application is far more

confined than in the statutory fee-shifting context.  See United States ex rel.

C.J.C., Inc. v. Western States Mechanical Contractors, Inc., 834 F.2d 1533, 1547-

48 (10th Cir. 1987).  The Supreme Court has pointed out the striking contrast by

holding fee-shifting statutes:

> were not designed as a form of economic relief to improve the
> financial lot of attorneys, nor were they intended to replicate exactly
> the fee an attorney could earn through a private fee arrangement with
> his client.  Instead, the aim of such statutes was to enable private
> parties to obtain legal help in seeking redress for injuries resulting
> from the actual or threatened violation of specific federal laws.

Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546,

---

[4](...continued)
mutually agreeable.  Perhaps a different term, such as 'prevailing'
hourly rate or 'market norm' should be employed.
Medlock v. Ortho Biotech, Inc., 1997 WL 51216, at *2 n.3 (D. Kan. 1997).  I
agree and use the word "reasonable" only within its customary meaning as a term
of art and not as a criticism of an attorney's billing practices.

- 6 -

565 (1986).

## II. Specific Components of Award

*Partial Success*

The district court's opinion is ambiguous with respect to the role plaintiffs' degree of success played in the ultimate attorney fee award. At one point, the district court notes plaintiffs achieved only partial success because they failed to show a violation of their rights under the Free Exercise Clause of the First Amendment and recovered only nominal damages. Appellants' Br., Ex. A. at 3. Yet later, the court describes plaintiffs' success as "great." Id. at 4. In reducing plaintiffs' attorney's requested hours, the court then states its reductions reflect time "not reasonably necessary and thus . . . not reasonably expended on [the] litigation." Id. at 6.

If, as the majority interprets the preceding statements, the district court decreased plaintiffs' reimbursable hours based on their failure to prevail on the Free Exercise claim and recover more than nominal damages, the court abused its discretion. This case was not about money. Plaintiffs had one primary goal in bringing suit: forcing the City of Edmond to remove the Latin cross from its official seal. Plaintiffs were fully successful in that endeavor. The fact that plaintiffs achieved this result pursuant to their Establishment Clause claim rather than their alternative Free Exercise claim is irrelevant for fee purposes. A "fee

award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." Hensley v. Eckerhart, 461 U.S. 424, 435 (1983).

If, on the other hand, the district court reduced plaintiffs' attorney fees solely as a result of their excessive request, there was no abuse of discretion. This ambiguity highlights why it is so essential that district courts articulate specific reasons for fee awards to give us an adequate basis for review. See Ramos v. Lamm, 713 F.2d 546, 552 (10th Cir. 1983). On remand, the district court should make clear the specific reasons for its reductions in plaintiffs' attorney fee application.

*Simplicity of case*

In articulating its rationale for rejecting the attorney fee award here, the majority focuses primarily on its disagreement with the district court's characterization of this case as a "fairly simple, straightforward lawsuit." Although the constitutional issues raised in this action may rest outside the expertise of many practitioners, it is not "clear error" to classify the case as "fairly simple."

The discovery disputes the majority considers pivotal to the difficulty of the case involve three motions by defendants: a motion to compel one piece of

correspondence, a motion to strike experts based on plaintiffs' failure to adhere to the court's scheduling order, and a motion in limine to exclude all testimony relating to settlement and compromise negotiations. These pleadings represented standard pretrial maneuvering. Indeed, the fact that the parties filed only three non-dispositive pretrial motions is, if anything, evidence of the simplicity of the case. Further, the litigants' decision to depose every named party in preparation for the two-day trial hardly suggests the lawsuit was atypical or particularly complex.

The majority also attaches considerable significance to the "reams of legal analysis" generated in the case. Some perspective, however, is necessary. First, it appears defendants filed a motion to dismiss all individual capacity claims based on qualified immunity (which was granted) and each side filed a single summary judgment motion on the merits.[5] Plaintiffs' motion contained only fifteen pages of argument. Second, although two special interest groups–the Christian Legal Society of Oklahoma and Citizens for Keeping the Cross–opted to file amicus briefs, their presence does not speak to the difficulty of the case; it indicates only that they sought to influence the court's opinion. Third, the "difficult" ancillary issues the majority identifies either were not raised by the

---

[5]Plaintiffs submitted one summary judgment motion on March 15, 1994, and a second motion on March 29, 1994. They include only the March 29 motion in their appendix, leading me to believe the latter superseded the former.

litigants (e.g., Article III standing for Establishment Clause claims), had no merit (e.g., plaintiffs' objections to defendants' qualified immunity defenses), or played, at best, a de minimis role in the case (e.g., attorney-client privilege).[6]

Finally, the fact that "thoughtful jurists strongly disagreed" over the proper outcome of the litigation does not, *ipso facto*, mean the case was complex. The district court observed the "case was virtually a single-issue one, as to whether the average observer, when viewing the seal in question, would perceive it as conveying or attempting to convey primarily a message of endorsing Christianity, or that Christianity is favored or preferred." Appellants' Br., Ex. A at 5 n.2. This observation is not clearly erroneous. Just as reasonable minds may differ on the outcome of a horse race, so too may appellate courts diverge on their beliefs as to the message conveyed by a religious symbol. Chief Justice Rehnquist's dissent from the Supreme Court's denial of defendants' certiorari petition reflected his desire to create national uniformity on this issue. See City of Edmond v. Robinson, 517 U.S. 1201 (1996). His dissent is not a testament to the complexity

---

[6]The majority states one particularly difficult issue raised in the case was the propriety of the "use of experts to gauge public perceptions of religious symbols." Majority Op. at 15. Nowhere does the record reflect any litigant advanced this matter. I can only assume the majority predicates this statement on defendants' motion to strike plaintiffs' experts, a motion not included in the record on appeal. The docket sheet suggests, however, that defendants filed that motion based on plaintiffs' failure to follow the court's scheduling order.

of the case.[7]

Even assuming, *arguendo*, this case was complex, the district court did not err in classifying plaintiffs' fee application as unreasonable. Defendants liken plaintiffs' litigation strategy to "using an atom bomb to kill a fly." Appellees' Br. at 9. I agree. Plaintiff's attorney appears to have exercised no billing judgment in his fee application. See Ramos, 713 F.2d at 553 (court must distinguish "raw" time from "billable" time because "it does not follow that the amount of time actually expended is the amount of time reasonably expended"). Moreover, the pleadings included in the record on appeal are replete with prolix and repetitious arguments as well as innumerable extraneous materials. In the attorney fee context, there is a fundamental difference between advocacy and overkill. Plaintiffs clearly crossed that line.

*Comparison of billings and defendants' failure to
challenge portions of plaintiffs' fee application*

The majority criticizes the district court for failing to take into account the billings of defendants' attorneys in calculating plaintiffs' fee award. We have held that "[i]n determining what is a reasonable time in which to perform a given task or to prosecute the litigation as a whole, the court should consider that what

---

[7]Nor is the fact that we remanded the case to the district court on the merits dispositive. Procedural machinations seldom provide a window into the simplicity or difficulty of a lawsuit.

- 11 -

is reasonable in a particular case can depend upon factors such as . . . the responses necessitated by the maneuvering of the other side." Ramos, 713 F.2d at 554. The majority acknowledges "the hours expended by defense counsel is not . . . an immutable yardstick of reasonableness" and "may be disregarded or discounted as a comparative factor if found to be unreasonable." Majority Op. at 21. In the next sentence, however, the majority implies "the tooth-and-nail litigating approach [defendants] used in this case" necessitates a comparison to defendants' attorneys' work. (Id.).

The majority has substituted its own discretion for that of the district court. The district court specifically remarked in its attorney fee order that "Defendants' reliance on the historical significance of the cross and other features of the seal in defense of Plaintiffs' Establishment Clause claim did complicate and protract the litigation." Appellants' Br., Ex. A at 5. There is nothing in the record to suggest the district court neglected to compensate plaintiffs' attorney for time spent opposing such matters. But the mere fact that one party's attorney bills for an unreasonable number of hours does not a fortiori mean his adversary's attorney can expect to be reimbursed for doing the same. As we recently pointed out in Case v. Unified Sch. Dist. No. 233, 1998 WL 714055, at *6 (10th Cir. Oct. 13, 1998), "[t]o hold otherwise would allow two law firms which, although adversaries in the proceeding, were in agreement in their use of unreasonable

billing practices, to force the district court to award compensation it found unreasonable."

Handcuffing a court from reducing a fee award below a level to which the non-prevailing party has specifically raised objections invites the same type of collusion and excesses. As long as the district court provides an adequate explanation for its calculations, see Mares, 801 F.2d at 1202-03 (describing level of detail required), a comparison between the court's award and the non-prevailing party's billings is irrelevant.

III.

The only basis for remanding this case to the district court is to secure a clarification of the degree of reductions made for plaintiffs' limited success and improper block billing.[8] I fear the scrutiny imposed by the majority in this appeal will foster the exact type of distasteful attorney fee disputes against which both the Supreme Court and the Tenth Circuit have counseled. See Hensley, 461 U.S. at 437; Mares, 801 F.2d at 1203. The broad discretion of district courts in fashioning attorney fee awards must be respected less we turn every attorney fee

---

[8] The majority has given the district court virtually no guidance on how to handle the case on remand. Short of awarding plaintiffs their full fee request, it is not clear what the district court is to do. I would suggest the district court provide a detailed and specific explanation of any aspect of plaintiffs' attorney fee application it finds unreasonable and calculate an award based on those findings.

- 13 -

motion into a "second major litigation." Hensley, 461 U.S. at 437. Because I do not believe the majority opinion is faithful to this principle, I respectfully dissent.